UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------- X
                                   :
R.B. and M.L.B., individually, and :    15cv6331 (DLC)
on behalf of D.B.,                 :
                                   :    OPINION AND ORDER
                Plaintiffs,        :
                                   :
        -v-                        :
                                   :
NEW YORK CITY DEPARTMENT OF        :
EDUCATION,                         :
                                   :
                Defendant.         :
                                   :
--------------------------------- X

APPEARANCES:

For the plaintiffs:
Gary S. Mayerson
Mayerson and Associates
330 West 38 Street, Suite 600
New York, NY 10018

For the defendant:
Son K. Le
New York City Law Department
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

     R.B. and M.L.B. (collectively, the "Parents") appeal from

the decision of the State Review Officer ("SRO") denying

reimbursement for tuition under the Individuals with

Disabilities Education Act ("IDEA") for their son, D.B.  The

Parents principally raise four procedural deficiencies and three

substantive deficiencies in the individualized education

programs ("IEP") prepared for D.B. by the New York City

Department of Education (the "Department") for the 2013-2014 and 2014-2015 school years.  The procedural deficiencies are that (1) the IEPs did not include required vocation and transition planning, (2) the IEPs did not include appropriate and objectively-measurable annual goals and short-term objectives, (3) the IEPs were impermissibly predetermined, and (4) the Department did not give the Parents prior written notice for the 2013-2014 school year.  The substantive deficiencies are that (1) the student-to-faculty ratio proposed in both IEPs provided inadequate support to D.B., (2) the school sites recommended for D.B. were inadequate, and (3) the teaching methodology that would be used in the recommended classrooms would be inappropriate for D.B.  For the reasons that follow, the decision of the SRO is affirmed and the Department's motion for summary judgment is granted.

## Background

The following facts are taken from the administrative record or are undisputed by the parties.

## I.   D.B.'s Background

D.B. is a seventeen-year-old boy who is diagnosed on the autism spectrum and has significant developmental delays.  Under the IDEA, D.B. is entitled to receive a free appropriate public education ("FAPE") from the Department.  Alternatively, if the

Department fails to provide a FAPE, the Parents may enroll D.B. in private school and obtain reimbursement from the Department, subject to certain restrictions.  D.B. has never attended public school.  He has attended the Rebecca School since the 2009-2010 school year.  The Parents have sought reimbursement from the Department for every school year since 2009-2010, but have never prevailed.  Notably, the Parents were unsuccessful in obtaining reimbursement for the 2011-2012 school year after both the administrative officers, the District Court, and the Second Circuit Court of Appeals found no denial of a FAPE.  See R.B. v. New York City Dep't of Educ., 15 F. Supp. 3d 421 (S.D.N.Y. 2014), aff'd, 603 F. App'x 36 (2d Cir. 2015).  The instant appeal concerns challenges to the IEPs for the 2013-2014 and 2014-2015 school years.

## II.  The Individualized Education Programs

On May 9, 2013, the Committee on Special Education ("CSE") met for approximately two hours and drafted the IEP for the 2013-2014 school year.  Present at this meeting were (1) D.B.'s mother, M.L.B., (2) the Department's psychologist, Rose Fochetta ("Ms. Fochetta"), (3) D.B.'s teacher from the Rebecca School, Andrea Gutzeit, (4) the Department's special education teacher, Feng Ye, (5) a representative for the Parents, Sandra Morabito, and (6) the Rebecca School Transitions Program Supervisor, Marguerite Cohen.  According to the IEP, although D.B. had low

3

scores on a psychoeducational evaluation, he had a desire to communicate and interact with adults and to participate in class activities.  D.B. generally understands what is expected of him in school but often becomes distracted by his environment or his own actions.  The IEP recommended the following occupational therapy ("OT") interventions: sensory and movement breaks throughout the day, visual supports, verbal prompts, multimodal learning, small group instruction, language broken down into manageable chunks, use of high interest activities, use of a calm affect when D.B. is upset, use of graphic organizers, and additional time for D.B. to process information.

The IEP contained a section entitled "measurable postsecondary goals" which stated that the Parents wanted D.B. eventually to live and work independently, and that D.B.'s course of study would focus on his transition needs.  The IEP also contained eighteen measurable annual goals, ten of which had accompanying short-term instructional objectives and/or benchmarks.  A class with a ratio of 6:1:1 was recommended.[1]  The school recommended for D.B. for the 2013-2014 school year was P.S. 138, which is located at 225 E. 23rd Street.  The Parents enrolled D.B. at the Rebecca School for the 2013-2014 school

[1] A 6:1:1 ratio indicates a ratio of six students, to one teacher, to one paraprofessional.  Paraprofessionals are teaching assistants who provide instructional services to students under the general supervision of a certified teacher.

4

year on May 6, 2013 and notified the Department of their rejection of the 2013-2014 IEP on June 17, 2013.

For the following school year, the CSE met for approximately two hours on January 17, 2014, and drafted the IEP for the 2014-2015 school year.  Present at that meeting were (1) D.B.'s mother, M.L.B., (2) the Department's psychologist, Ms. Fochetta, (3) the Department's special education teacher, Feng Ye, (4) D.B.'s teacher from the Rebecca School, Andrea Gutzeit, and (5) a social worker from the Rebecca School, Joshua Noble.

This IEP contained four measurable postsecondary goals and twelve annual goals, ten of which had accompanying short-term instructional objectives and/or benchmarks.  As with the prior year, a classroom with a 6:1:1 ratio was recommended for D.B. The school recommended for D.B. for the 2014-2015 school year was P.S. M226, which is located at 345 E. 15th Street.  In May 2014, the Parents rejected the 2014-2015 IEP and enrolled D.B. at the Rebecca School for that school year.  After rejecting the IEP, on June 20, the Parents visited the assigned school site.

**III.  The IHO Hearing & Decision**

On July 21, 2014, the Parents requested a hearing before an impartial hearing officer ("IHO") and sought reimbursement for the 2013-2014 and 2014-2015 school years, arguing that both IEPs denied a FAPE to D.B.  The Parents raised 148 purported deficiencies in the two IEPs, twelve of which they termed "core

claims" in their closing brief.  After holding hearings from October 15 to November 19,[2] the IHO found that both IEPs were procedurally and substantively inadequate, causing a deprivation of educational benefits and rising to the level of a denial of a FAPE.  Specifically, the IHO held: (1) the vocational and transition recommendations for both school years were deficient, (2) the annual goals and short-term objectives for both school years were deficient and insufficiently measurable, (3) the IEPs for both school years were impermissibly predetermined, (4) the Department failed to give the Parents prior written notice for the 2013-2014 school year, (5) the recommended 6:1:1 classroom would be unduly restrictive and not likely to result in D.B.'s progress in social interactions, (6) the teaching methodology typically used in the recommended 6:1:1 classroom would not be effective for D.B., and (7) the recommended school sites for both years were not equipped to carry out the IEPs.

The IHO also found that the Rebecca School was an appropriate placement for D.B. and that the relevant equitable considerations favored reimbursement.  Accordingly, the Department was ordered to reimburse the Parents for the cost of tuition at the Rebecca School for the 2013-2014 and 2014-2015 school years.

---

[2] The IHO held hearings on six days during this time period: October 15 and 29, and November 6, 7, 14, and 19.

IV.   **The State Review Officer Appeal**

   The Department appealed the decision of the IHO to an SRO.
The Parents cross-appealed, arguing that the IHO should have
addressed additional bases on which they claimed D.B. was denied
a FAPE.  The SRO reversed the decision of the IHO, and dismissed
the plaintiffs' cross-appeal, finding that the IEPs for the
2013-2014 and 2014-2015 school years did not deny a FAPE to D.B.
Specifically, the SRO held: (1) neither of the IEPs were
impermissibly predetermined, (2) the failure to provide prior
written notice for the 2013-2014 school year was a procedural
violation but did not deny a FAPE to D.B., (3) the annual goals
and short-term objectives for both school years were adequate,
(4) the recommendation of a 6:1:1 classroom was reasonably
calculated to meet D.B.'s education needs, (5) the failure to
conduct a formal vocation assessment of D.B. was a procedural
deficiency but did not deny a FAPE to D.B., (6) the Department
was not required to specify a particular teaching methodology,
and moreover, there no showing that D.B. required any particular
teaching methodology, and (7) the Parents' objections to the
recommended schools sites could not be considered because they
were based on retrospective observations of the schools.

V.   **Procedural History**

   The Parents filed their complaint in federal court on
August 11, 2015, appealing the decision of the SRO, and seeking

a declaration that (1) the Department failed to offer D.B. a FAPE for the 2013-2014 and 2014-2015 schools years, (2) that D.B.'s placement at the Rebecca School for the 2013-2014 and 2014-2015 schools years was reasonably calculated to provide D.B. with meaningful education benefits, and (3) that the equities favor plaintiffs' reimbursement.  The Parents sought tuition reimbursement for the 2013-2014 and 2014-2015 school years as well as leave to submit a fee application for the purposes of attorney's fees and other costs.  The Department filed its answer on October 16.

On December 23, the Parents filed a motion for summary judgment on all their claims.  This case was reassigned to this Court on January 14, 2016.  On February 5, the Department filed a cross-motion for summary judgment, seeking affirmance of the SRO's decision and dismissal of the Parents' complaint in its entirety.  The Parents' motion became fully submitted on March 8.  The Department's motion became fully submitted on April 4.

The Parents' papers address many facts and issues, and some issues are addressed in multiple sections.  The organizational structure of the Parents's brief thus makes it difficult to discern their lines of argument with precision.  These papers appear to raise seven separate arguments, and the discussion that follows is organized accordingly.

## Discussion

### I.  Legal Standard

Although the parties style the instant motion as one for summary judgment, the "procedure is in substance an appeal from an administrative determination." T.K. v. New York City Dep't of Educ., 810 F.3d 869, 874 n.2 (2d Cir. 2016) (citation omitted).  "In reviewing a state administrative proceeding under the IDEA, the Court must engage in an independent, but circumscribed, review, more critical than clear-error review but well short of complete de novo review." Id. at 875 (citation omitted).  In deciding factual issues, a district court must decide based on the preponderance of the evidence. T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009); see also 20 U.S.C. § 1415(i)(2)(C)(iii).  Due weight must be given to the state proceedings, with particular deference afforded where "the state hearing officers' review has been thorough and careful." T.K., 810 F.3d at 875 (citation omitted).  The Second Circuit has cautioned that "federal courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. (citation omitted).  When the conclusions of an IHO and SRO differ, the Court must accept the determination of the SRO as the decision entitled to deference "unless it concludes that the [SRO] decision was inadequately reasoned."

9

R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012).  The SRO's decision is entitled to deference because it is thorough and well-reasoned, addressing each of the claims and supporting its holdings with citations to the administrative record.

## II.  The Individuals with Disabilities Education Act

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  Under the IDEA, states have "an affirmative obligation to provide a basic floor of opportunity for all children with disabilities," meaning "an education likely to produce progress, not regression, and one that affords the student with an opportunity greater than mere trivial advancement."  T.K., 810 F.3d at 875 (citation omitted).

The principal method for states to achieve the mandate of the IDEA is the IEP, a written statement which by statute must contain, inter alia, the child's present level of performance, goals for improvement, and a plan about how to achieve that improvement.  T.K., 810 F.3d at 875; see also 20 U.S.C. § 1414(d).  If an IEP is substantively deficient, parents may reject the plan and seek reimbursement from the state for

private school tuition, subject to certain conditions.  T.K., 810 F.3d at 875; see also 20 U.S.C. § 1412(a)(10)(C)(ii).

Parents may also seek reimbursement where an IEP is procedurally deficient, but only if the procedural deficiencies "significantly impede the parents' participation rights, impede the child's right to a FAPE, or cause a deprivation of educational benefits."  T.K., 810 F.3d at 875.  Even when a denial of a FAPE is found, parents will only be reimbursed for tuition if the alternative school chosen by the parents "is appropriate to the child's needs" and equitable considerations favor reimbursement.  T.K., 810 F.3d at 875.

The burden of establishing the validity of the IEP is on the Department.  Id.  Thus, in reviewing an IDEA determination, the Court must determine (1) whether the state complied with the procedures of the act, (2) whether the IEP is reasonably calculated to enable the child to receive education benefits, and (3) whether the private schooling obtained by the parents is appropriate for the child needs, taking into consideration the relevant equities.  M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 (2d Cir. 2012); see also Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985).

### III.   Procedural Adequacy of the IEPs

#### A. Vocational Assessment and Transition Planning

The Parents contend that both the 2013-2014 and 2014-2015 IEPs were deficient because the Department failed to identify measurable postsecondary goals based upon age-appropriate transition assessments and failed to conduct a functional vocational assessment of D.B.  Specifically, the Parents assert (1) that the Department never assessed D.B., although he is verbal and relatively conversational, (2) that D.B.'s interests were not taken into account, and (3) interviewing only D.B.'s mother was insufficient to constitute a functional vocational assessment.

Once a child attains the age of sixteen (fifteen under New York regulations),[3] the IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills [and] the transition services (including courses of study) needed to assist the child in reaching those goals."  20 U.S.C. § 1414(d)(1)(A).  Transition services refers to "a coordinated

---

[3] The IDEA incorporates some, but not all, state regulations when they exceed the floor set by federal law.  See D.D. ex rel. V.D. v. New York City Bd. of Educ., 480 F.3d 138, 139 (2d Cir. 2007). The parties do not dispute that the Department had to begin vocational assessments when D.B. turned fifteen.

set of activities for a child with a disability that . . . is
designed to be within a results-oriented process, that is
focused on improving the academic and functional achievement of
the child with a disability to facilitate the child's movement
from school to post-school activities."  20 U.S.C. § 1401(34).
Transition services must be "based on the individual child's
needs, taking into account the child's strengths, preferences,
and interests."  Id.

     The Department did not conduct a formal vocational
assessment of D.B. prior to creating the 2013-2014 IEP.  As the
SRO found, however, the CSE had sufficient information to
develop appropriate transition services for D.B and included
vocational goals in the IEP.  The Department invited D.B. to be
present at the 2013 CSE, but the Parents declined to bring him
because they believed he could not sit through a two-hour
meeting.  The school psychologist, Ms. Fochetta, testified that
she asked questions of the Parents that mirrored a formal
vocational assessment.  The Department and the Parent also
discussed post-secondary goals during the 2013 CSE, including
(1) the necessary skills to target as well as the Parents'
ultimate goals for D.B., (2) D.B.'s post-secondary goals, (3)
D.B.'s long-term goals for possibly living independently, (4)
the importance of job training and the possibility of D.B.
attending college, and (5) the Parents' desire that D.B. do

13

things he enjoyed.  Moreover, the 2013-2014 IEP addressed D.B.'s post-secondary goals and transition needs, including that (1) the Parents considered job training to be important and had not ruled out college as an option for D.B., (2) the Parents wanted D.B. to find a job he cares about, (3) the Parents would like for D.B. to live and travel independently, (4) D.B. needed to continue focusing on his course of study in order to meet his transition goals, and (5) D.B. had been participating in an internship at a radio station.  Accordingly, although the failure to conduct a formal vocational assessment was a procedural violation, it did not impede D.B.'s right to a FAPE, significantly impede the Parents' opportunity to participate in the decision-making process, or cause a deprivation of educational benefits.

The Department also failed to conduct an in-person assessment of D.B. prior to creating the 2014-2015 IEP.  The Department invited D.B. to be present for the CSE meeting but the Parents again decided not to bring him because he would have trouble sitting through a two-hour meeting.  The school psychologist was present at the CSE meeting and testified that she asked M.L.B. several questions in order to determine D.B.'s interests, likes, and strengths, and that the CSE used that data in developing post-secondary goals for D.B.  The Department's minutes for that meeting indicate that D.B. has an interest in

music, food, ceiling fans, and people.  The CSE notes also indicate D.B.'s strengths, interests, and the skills D.B. would need to pursue to reach his goals.  Consistent with these notes, the 2014-2015 IEP, under the heading of "Measurable Postsecondary Goals," provides that D.B. has interests including music, ceiling fans, food, and people.  The IEP also stated that D.B. would participate in an internship to determine an appropriate area of employment for him.

To facilitate D.B.'s transition from school to post-secondary activities, the school was to arrange for the following activities for D.B.: (1) go out into the community to purchase items independently and obtain the correct change, (2) learn appropriate telephone and workplace etiquette, (3) learn to travel within the community independently, (4) learn to make a budget and shop for his own food, and (5) correctly identify emergency situations and the appropriate response.  The record shows that the CSE had adequate information to develop a vocational plan for D.B. and that the IEP included adequate vocation and transitional goals.  Accordingly, the failure to conduct an in-person vocational assessment did not deny a FAPE to D.B.

The Parents' argument to the contrary fails.  The Parents argue that the IDEA permits, but does not require, that D.B. attend the CSE meeting.  They further argue that the Department

had a duty to assess D.B. and could have done so prior to the
CSE meeting.  See 34 C.F.R. § 300.324 (listing factors the CSE
must consider).  Neither the regulation nor the case law,
however, impose the duty on the Department to conduct an in-
person interview of a child.  The duty is to obtain and consider
relevant information prior to drafting the IEP.  The record
shows that even without interviewing D.B. in person, the CSE had
sufficient information to develop vocational goals for the IEP
after the school psychologist spoke to D.B.'s mother about
D.B.'s vocation needs.  Accordingly, the Department's failure to
assess D.B. personally prior to the CSE meetings, and its
decision to instead interview D.B.'s mother, did not result in a
denial of a FAPE.

**B. Annual Goals & Short-Term Objectives**

The Parents argue that both the 2013-2014 and 2014-2015
IEPs failed to include appropriate and objectively-measurable
goals.  Specifically, they contend that the 2013-2014 goals are
vague and non-measurable and that six of the goals do not have
short-term objectives.  They also contend that the 2014-2015
goals did not address D.B.'s decoding and comprehension skills,
that the one math goal included was vague and unmeasurable, and
that the short-term goals were actually annual goals and did not
contain intermediate steps.

With respect to annual goals and short-term objectives, an

16

IEP must include "a statement of measurable annual goals,
including academic and functional goals." 20 U.S.C.
§ 1414(d)(1)(A). For students with a disability, "the IEP shall
include a description of the short-term instructional objectives
and/or benchmarks that are the measurable intermediate steps
between the student's present level of performance and the
measurable annual goal." 8 NYCRR 200.4(d)(2)(iv). The Second
Circuit has held that "the sufficiency of goals and strategies
in an IEP is precisely the type of issue upon which the IDEA
requires deference to the expertise of the administrative
officers." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377,
382 (2d Cir. 2003).

    The 2013-2014 IEP contained eighteen annual goals: (1)
recognize and label feelings in self and others by making
inferences from the situation and non-verbal cues, (2) use
appropriate comments to initiate and terminate a conversation
with an adult, (3) participate appropriately with a peer in a
game or activity, (4) follow four 1-step directions with no more
than two verbal/physical cues and attend to a task for at least
five minutes, (5) copy a paragraph and five math problems with
proper word spacing and appropriate letter size, (6) tolerate a
"sensory motor processing" diet, (7) given visual/verbal cues,
develop comprehension by demonstrating the ability to answer
various types of questions, (8) given visual/verbal cues,

17

develop comprehension by demonstrating the ability to recall and retell details from a story, (9) develop decoding skills by demonstrating the ability to identify and decode "vowel teams" when given texts in the late second to early third grade range, (10) develop functional math and money skills relating to real world situations, (11) develop writing skills, (12) develop hand writing skills, (13) improve social skills through the engagement of certain tasks, (14) improve pragmatic language skills, (15) improve receptive language skills, (16) improve expressive language skills, (17) improve sensory processing skills, and (18) improve motor planning skills.

For each of the goals, the IEP indicates (1) the criteria for which the goal will be measured (for example, "80% accuracy over four consecutive therapy sessions"), (2) the method of measuring progress (for example, "therapist observations and informal testing"), and (3) the frequency that progress will be measured (for example, "1 time per quarter").  Ten of the goals are further subdivided into short-term objectives.  For example, the goal of improving writing skills lists the following short-term objectives: (1) use a period at the end of a sentence consistently and independently, (2) use an exclamation/question mark consistently and independently, (3) write two to three logically connected sentences on a topic, (4) write five sentences about personal experiences, and (5) generate two to

three ideas on a given non-preferred topic.

According to the testimony of the school psychologist, Ms. Fochetta, the annual goals and short-term objectives were developed based in part on a speech-language evaluation conducted with D.B. in January 2013.  The goals were also based on discussions with the Parents and D.B.'s teacher from the Rebecca School.  According to Ms. Fochetta, the goals in the 2013-2014 IEP reflected the Parents' concerns about pronoun use as well as D.B.'s specific skill levels.  The record indicates that no one in attendance at the 2013 CSE meeting voiced any objection to the goals or requested the inclusion of additional short-term objectives.

The goals and short-term objectives in the 2013-2014 IEP were sufficiently measureable to satisfy the requirements of 20 U.S.C. § 1414(d)(1)(A).  Although the IEP did not include a goal for decoding or include short-term objectives for every goal, the IEP did provide enough detail to identify the relevant benchmarks and educational objectives and also provided appropriate bases to measure and track D.B.'s progress towards those goals.  As the SRO found in its well-reasoned opinion, the 2013-2014 IEP "provided sufficient information to guide a teacher instructing [D.B.] and measuring his progress."  Accordingly, the D.B. was not denied a FAPE on this basis.

The 2014-2015 IEP contained twelve goals: (1) develop

reading skills, (2) develop functional math skills, (3) develop writing skills, (4) develop hand writing skills by maintaining appropriate letter size, spacing within and between words, and writing on lines, (5) use personal pronouns correctly when making a request verbally or in writing, (6) improve pragmatic language skills, (7) improve receptive language skills, (8) improve expressive language skills, (9) improve sensory processing skills, (10) improve motor planning skills, (11) improve social skills, and (12) improve flexibility.  For each of the goals, the IEP indicates (1) the criteria for which the goal will be measured (for example, "80% accuracy over 5 consecutive weeks"), (2) the method of measuring progress (for example, "speech and language pathologist and social education teacher consulting each other and working together documenting progress through observations and checklists"), and (3) the frequency that progress will be measured (for example, "1 time per week").

Ten of the goals are further subdivided into short-term objectives.  For example, the goal of improving pragmatic language skills lists the following short-term objectives: (1) remain on topic in a verbal interaction during both non-preferred and academic topics, (2) maintain appropriate pitch and volume when engaging with others, (3) use appropriate comments to initiate and terminate a conversation with another,

and (4) identify and label feelings in himself and others through identifying non-verbal cues and body language when prompted by an adult.

According to the school psychologist, Ms. Fochetta, the annual goals in the 2014-2015 IEP were developed based on input from the Department's special education teacher, D.B.'s teacher at the Rebecca School, a social worker from the Rebecca School, and the Parents.  During the CSE meeting, the participants discussed D.B.'s reading skills, his attention and organization skills, his social skills, his management needs, and the Parents' concerns.  The record indicates that the goal relating to pronoun use was added at the request of the Parents.

The goals and short-term objectives in the 2014-2015 IEP were sufficiently measurable.  Although two of the goals do not list any short-term objectives, the IEP did provide enough detail to identify the relevant benchmarks and educational objectives and also provided appropriate bases to measure and track D.B.'s progress towards those goals.  As the SRO found, the 2014-2015 IEP "addressed the needs of the student as identified in the present levels of performance detailed in the January 2014 IEP."  Accordingly, the goals and short-term objectives in the 2014-2015 IEP were adequate and did not deny D.B. a FAPE.

21

**C. Predetermination**

The Parents argue that both the 2013-2014 and 2014-2015 IEPs were impermissibly predetermined.  Specifically, they allege that the Department was close-minded to considering any other option besides its preferred 6:1:1 program.  The Parents also argue that they were denied meaningful participation in developing the IEPs in both years.

Under the IDEA, parents have a right to participate in meetings with respect to placement of the child and the provision of a FAPE to the child.  34 C.F.R. § 300.501(b). Specifically, a parent has a right to be a member of the group that makes placement decisions, and a school district may not make placement decisions without the involvement of the parent. 34 C.F.R. § 300.501(c).  Although school districts may not predetermine the educational program offered in an IEP, they may engage in "preparatory activities to develop a proposal or response to a parent proposal that will be discussed at a later meeting."  T.P., 554 F.3d at 253 (citation omitted).  An IEP is not predetermined so long as the district involves the parent in the development of the IEP with an "open mind."  Id.  Parents are entitled to provide input in the IEP process but do not have the right to veto decisions with which they disagree.  T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 420 (2d Cir. 2009).

With respect to the 2013-2014 IEP, D.B.'s mother, M.L.B.,

22

and D.B.'s teacher from the Rebecca School were both present at the CSE meeting and were given an opportunity to object to the use of a 6:1:1 ratio.  The CSE considered several different ratios for D.B., including 12:1:1 and 8:1:1, and also considered placement in different types of schools, but ultimately these alternative options were "ruled out as too large, [and] insufficiently supportive" because "[D.B.] requires a smaller student to teacher ratio to meet his specific constellation of needs."  According to the record, the CSE meeting lasted for approximately two hours, and the minutes indicate that several of the Parents' concerns were discussed.  The 2013-2014 IEP itself incorporates several of the Parents' comments and concerns, such as (1) that the occupational therapy evaluation should not be relied upon because the OT only spent less than ten minutes with D.B., (2) a request that a goal for improving hand-writing be included in the IEP, (3) that a 1:1 paraprofessional is important for D.B's social development, (4) that occupational therapy is needed within the school day, (5) that D.B. needs sensory support throughout the day, (6) that D.B. had an internship and needed it for job training, (7) that some interaction with typical peers is important for D.B., and (8) that the students in the 6:1:1 classes are "low functioning" and were presumably not appropriate classmates for D.B.  The IEP also reflects input from D.B.'s teacher at the Rebecca School

concerning D.B.'s development and needs.

The 2013-2014 IEP was not impermissibly predetermined.  The record establishes that one of the Parents was present at the CSE meeting and had an opportunity to voice her concerns.  The IEP reflects several of the Parents' concerns and also incorporates the view of D.B.'s teacher at the Rebecca School.

With respect to the 2014 CSE meeting, D.B.'s mother, M.L.B., was present and voiced her comments and concerns regarding the IEP.  According to the record, M.L.B. was actively involved at the meeting, which lasted approximately two hours. Specifically, the 2014-2015 IEP reflects the Parents' concerns, including (1) a request that D.B. have access to appropriate non-disabled peers, (2) that the functional levels of other students in a 6:1:1 classroom will not allow D.B. to be functionally grouped, (3) that occupational therapy would be needed during the school day rather than after school, (3) that the TEACCH[4] methodology would not be appropriate for D.B., and (4) that a 2:1 classroom ratio is most appropriate for D.B.  The IEP also reflects a concern by D.B.'s teacher at the Rebecca School that D.B. would need more attention than could be provided in a 6:1:1 setting, and that D.B. would have difficulty

---

[4] The TEACCH method refers to Treatment and Education of Autistic and Communication Handicapped Children, a program for instructing students with autism.

remaining focused and attentive in such an environment.  The
record indicates that the CSE considered several alternative
classroom ratios, including 8:1:1 and 12:1:1, but rejected them
because it concluded they would be insufficiently supportive to
D.B.'s needs.

For many of the same reasons, the 2014-2015 IEP was not
impermissibly predetermined.  The record establishes that one of
the Parents was present at the CSE meeting and had an
opportunity to voice her concerns.  The IEP reflects several of
the Parents' concerns and also incorporates the view of D.B.'s
teacher at the Rebecca School.

The Parents' argument to the contrary is unavailing.  The
parents rely on E.H. v. New York City Dep't of Educ., 2016 U.S.
Dist. LEXIS 18537 (S.D.N.Y. Feb. 16, 2016), in which an IEP was
found to be predetermined because the CSE failed to consider a
parent's concern that the 6:1:1 ratio would be inadequate.  E.H.
relied on the Sixth Circuit's decision in Deal v. Hamilton Cty.
Bd. of Educ., 392 F.3d 840, 858 (6th Cir. 2004), for the
proposition that an IEP can be predetermined even when the
parents are afforded the opportunity to speak at the CSE meeting
if the school district failed to adequately involve the parents
in a collaborative process.  E.H., 2016 U.S. Dist. LEXIS 18537
at *24.  When asked to adopt the reasoning in Deal, the Second
Circuit distinguished Deal as applying where a school district

"consistently rejected parent requests" for a particular type of instruction, such that it did not have an open mind with respect to drafting the IEP.  T.P., 554 F.3d at 253.  ("Though not bound by Deal, we find it distinguishable [because in Deal,] the school district had consistently rejected parent requests for intensive [Applied Behavioral Analysis] and told the parents that 'the powers that be' were not implementing such programs.")

The record here does not indicate that the Department categorically rejected the Parents' preferred ratio without due consideration.  The CSE considered several different classroom options and heard the Parents' concerns with the 6:1:1 ratio. While the Parents' were ultimately unsuccessful in convincing the CSE to approve their request, the record reflects that the Department did not approach the drafting of the IEP with a closed mind.

**D. Prior Written Notice**

The Parents argue that the Department failed to give them prior written notice of the 2013-2014 IEP and that this failure constituted a denial of FAPE.  The Department concedes that it failed to give prior written notice to the Parents for the 2013-2014 school year.  Under the IDEA, a district must provide written notice to the parents of a child, a reasonable time before (1) initiating or changing the identification, evaluation, or education placement of the child or the provision

26

of a FAPE to the child, or (2) refusing to initiate or change the identification, evaluation, or educational placement of the child or the provision of a FAPE to the child.  34 C.F.R. § 300.503.

Although this failure on the part of the Department was technically a procedural violation, the record confirms that the failure to provide prior written notice did not impede the rights of D.B. or the Parents.  As discussed above, the Parents were active participants in the 2013 CSE meeting, and their inputs were incorporated in the 2013-2014 IEP.  The Parents do not contend that they were denied the opportunity to participate in the CSE meeting or to provide their comments or concerns regarding D.B.'s education.  Moreover, there is no genuine dispute that the Parents received actual notice of the IEP because the Parents visited the school recommended by the IEP after notifying the Department that they rejected the proposed placement.  Because the record indicates that the Parents were not prejudiced by the lack of prior written notice, the SRO's determination that D.B. was not denied a FAPE on this basis must be affirmed.

### E. Cumulative Effect of Procedural Deficiencies

The Parents argue that the multiple procedural violations throughout the process of developing D.B.'s IEPs collectively constitute a deprivation of a FAPE.  Having determined that none

of the procedural violations identified resulted in the denial
of a FAPE when considered individually, the Court must consider
whether their aggregate effect resulted in the denial of a FAPE.
See R.E., 694 F.3d at 191.  Here, the procedural deficiencies
were formalities and the record shows that the Parents were
afforded a full opportunity to participate in the IEP process.
The SRO's holding that the procedural violations did not result
in the denial of a FAPE, whether considered individually or
cumulatively, is affirmed.

## IV.  Substantive Adequacy of the IEPs

### A. Student/Teacher Ratio

The Parents raise several challenges to the classroom ratio
recommended in the IEPs.  First, the Parents argue that the
classroom ratio of 6:1:1, which D.B. was assigned, is
inappropriate for D.B.'s needs.  They claim D.B. requires 1:1
teaching support, in the form of a transition paraprofessional,
but that the IEPs for both school years failed to make that
recommendation.  Second, they argue that D.B. was not assessed
within a 6:1:1 classroom ratio and that there was no
justification to depart from D.B.'s then-existing classroom
ratio of 8:1:3, which was used at the Rebecca School.  Finally,
they assert that the 6:1:1 classroom ratio would be
inappropriate because D.B. would be placed with lower
functioning peers.

Under the IDEA, states must ensure that

> [t]o the maximum extent appropriate, children with
> disabilities . . . are educated with children who are
> not disabled, and special classes, separate schooling,
> or other removal of children with disabilities from
> the regular educational environment occurs only when
> the nature or severity of the disability of a child is
> such that education in regular classes with the use of
> supplementary aids and services cannot be achieved
> satisfactorily.

20 U.S.C. § 1412(a)(5).  "This requirement expresses a strong

preference for children with disabilities to be educated, to the

maximum extent appropriate, together with their non-disabled

peers."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752

F.3d 145, 161 (2d Cir. 2014) (citation omitted).

> "The implementing regulations require school districts
> to ensure that a continuum of alternative placements
> is available to meet the needs of children with
> disabilities," including "instruction in regular
> classes, special classes, special schools, home
> instruction, and instruction in hospitals and
> institutions."

Id. (citation omitted); see also 34 C.F.R. § 300.115(a), (b)(1).

"After considering an appropriate continuum of alternative

placements, the school district must place each disabled child

in the least restrictive educational environment that is

consonant with his or her needs."  T.M., 752 F.3d at 161.

In reviewing whether an IEP provides the least restrictive

environment ("LRE"), the court engages in a "flexible, fact-

specific analysis."  Id.  The Second Circuit has held that the

LRE requirement "does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning," but rather that "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." Id. (citation omitted).  Schools must therefore balance the restrictiveness of the student's environment with the educational benefits available to the student in such environment, seeking an optimal accommodation under the circumstances. M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 143 (2d Cir. 2013).

As a threshold matter, the Parents raised similar objections to the 6:1:1 classroom ratio in D.B.'s 2011-2012 IEP. In IDEA proceedings, the IHO, SRO, District Court, and Second Circuit all found that 6:1:1 ratio was sufficiently tailored to address D.B.'s educational needs.[5] R.B., 15 F. Supp. 3d at 421, aff'd, 603 F. App'x 36.  Similarly, the Court will defer to the SRO's determination that the recommendation of a 6:1:1 classroom was reasonably calculated to enable D.B. to receive a FAPE. This conclusion is amply supported by the record.  For example,

---

[5] The Parents argue that this case is distinguishable because the 2011-2012 IEP, unlike those at issue here, recommended a 1:1 paraprofessional in addition to the 6:1:1 classroom.  This distinction is not material because Ms. Fonchetta's testimony indicates that D.B. did not require a 1:1 paraprofessional because he does not exhibit behavioral problems.

the school psychologist, Ms. Fochetta, testified that:

> [D.B.] has significant needs that require, you know a
> lot of support, in a very small supportive, language
> based classroom setting.  And the 6:1:1 can provide
> that.  It is small.  There is only a total of – [D.B.]
> and it would be five other peers, with two adults in
> the classroom.  It is an intensive language based
> program, for students with significant needs. . . . We
> ruled out larger ratios that include 12 students, one
> teacher, and one para[professional], as well as eight
> students, one teacher, and one para[professional].
> And we also ruled out all of the ten month community
> school programs, because of [D.B.'s] significant
> needs.

Ms. Fochetta also testified that a 1:1 paraprofessional was not

necessary for D.B. because he did not exhibit any behavioral

concerns that would require constant one-on-one attention.  She

also stated that the 6:1:1 classroom would provide "a lot of

individual attention."  Accordingly, the Court defers to the

well-reasoned decision of the SRO that the 6:1:1 ratio was

reasonably calculated to provide D.B. with a FAPE.

**B. Proposed School Placements**

The Parents argue that the school placements recommended in

the 2013-2014 and 2014-2015 IEPs were not "viable" selections

for D.B. because the Department has not shown that either school

could timely implement the IEP for that year.  The Parents base

their argument on their observations during visits to the two

assigned schools after the IEPs were issued.

"[T]he IEP must be evaluated prospectively as of the time

of its drafting."  <u>R.E.</u>, 694 F.3d at 186.  Substantive attacks

on an IEP cannot be couched as speculative challenges to the
adequacy of a proposed placement.  Id. at 245.  If parents
reject an IEP and send a child to private school, testimony
concerning the adequacy of the public school is not considered
unless it shows that the proposed placement is "facially
deficient" because the "IEP cannot be implemented at a proposed
school." M.O. v. New York City Dep't of Educ., 793 F.3d 236,
244-45 (2d Cir. 2015).  For example, a court may consider
evidence that a school's cafeteria is not seafood-free if an IEP
called for a seafood-free environment due to a student's
allergy.  Id. at 244.  The Parents have not shown that either
placement was facially deficient.  Accordingly, the Parents
cannot rely on purported inadequacies of the placements to
challenge the IEPs.  R.E., 694 F.3d at 245.

Moreover, speculation that the recommended school sites
would not have adequately carried out the IEPs are not properly
considered because the Parents rejected the IEPs in favor of
placement in a private school.  Id.  For example, the fact that
some of the students at a recommended school had behavioral
problems does not mean that the school could not have placed
D.B. in a classroom without students with behavioral problems or
taken other steps to ensure D.B. was not exposed to students who
would interfere with his education.  Similarly, the fact that
the Parents believed the sensory equipment was inadequate for

D.B. does not mean the school did not possess, or have the capability to acquire, appropriate equipment to fulfill the requirements in the IEP.  Accordingly, the Parents' arguments concerning school selection do not succeed in undermining the deference owed to the SRO decision.

### C. Teaching Methodology

The Parents argue that the school selected for D.B. would have utilized the TEACHH methodology, which they claim is inappropriate for D.B.  Under the IDEA, students enrolled in special education should receive "specially designed instruction," which requires "adapting, as appropriate to the [student's] needs . . . the content, methodology, or delivery of instruction."  34 C.F.R. § 300.39(b)(3).  In reviewing a decision under the IDEA, the Court may not impose its view on the proper educational methodology used by the state.  Grim, 346 F.3d at 382; see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 207 (1982).

Neither the 2013-2014 nor the 2014-2015 IEP indicates a required teaching methodology.  The Parents' arguments concerning teaching methodology are based on the fact that the 6:1:1 programs typically use the TEACCH methodology.  As discussed above, evidence about how the Department would have carried out the IEPs if D.B. had been placed in public school should not be considered unless the Parents show that the

33

school's services were facially deficient and the school could not have carried out the IEP.  Here, nothing in the record establishes that the TEACCH method would have necessarily been used nor that the goals of the IEP could not have been accomplished using the TEACCH methodology.  For that reason, these arguments do not require further examination.[6]

---

[6] Moreover, even if the Court were to assume that the TEACCH methodology would have been used, it would defer to the well-reasoned decision of the SRO that "the record does not contain sufficient evidence upon which to conclude that the student required a specific educational methodology in order to receive a FAPE."

## Conclusion

The Court has considered the plaintiffs' remaining arguments and finds no grounds for reversal.[7]  The decision of the SRO is affirmed.  The Department's February 5, 2016 motion for summary judgment is granted.  The Parent's December 23, 2015 motion for summary judgment is denied.  The Clerk of Court shall enter judgment for the defendant and close the case.

Dated:    New York, New York
          May 19, 2016

                                _____
                                        DENISE COTE
                                United States District Judge

---

[7] In their Opposition & Reply Memorandum of Law, the Parents rely heavily on E.H. v. New York City Dep't of Educ., 2016 U.S. Dist. LEXIS 18537 (S.D.N.Y. Feb. 16, 2016), which awarded tuition reimbursement to another student at the Rebecca School.  With the exception of the issue of predetermination, which is addressed in detail above, this case is easily distinguishable because in E.H. (1) the parents argued that the IEP itself was untimely, (2) the student required a behavioral intervention plan due to behavioral problems, and (3) the parents claimed that the IEP was based on an outdated evaluation of the student and based on a methodology that was not itself recommended in the IEP.  These issues are not implicated here.